

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

No. 07-15-00054-CV

IN THE INTEREST OF A.C.B., A CHILD

On Appeal from the 46th District Court
Foard County, Texas
Trial Court No. 4771, Honorable Dan Mike Bird, Presiding

May 29, 2015

## MEMORANDUM OPINION

Before QUINN, C.J., and CAMPBELL and PIRTLE, JJ.

K.B. and J.B. appeal the termination of their parental rights by a jury to their eighteen-month-old daughter A.C.B. They contend the evidence is legally and factually insufficient to support four statutory grounds for termination as well as the finding that termination is in the best interest of the child. We affirm the termination order.

Because the case was submitted to the jury in broad form, we need only find the evidence sufficient to support a single statutory ground for termination and that the best interest of the child is served through termination. *In the Interest of D.N.*, 405 S.W.3d 863, 872 (Tex. App.—Amarillo 2013, no pet.). Clear and convincing evidence of the same is required which means that it will produce in the mind of the trier of fact a firm

belief or conviction as to the truth of the allegations sought to be established. *In the Interest of C.C.*, No. 07-12-00500-CV, 2013 Tex. App. LEXIS 5704, at *7 (Tex. App.—Amarillo May 8, 2013, no pet.). We must look at all the evidence in the light most favorable to the finding when conducting the legal sufficiency review and defer to the jury as factfinder in the resolution of evidentiary conflicts in favor of its findings when reasonable to do so and by disregarding evidence that it could reasonably have disbelieved. *Id.* at *7-8.

In conducting the factual sufficiency review, we consider whether the disputed evidence is such that a reasonable factfinder could not have resolved the disputed evidence in favor of its finding. *In the Interest of J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). In other words, "[i]f, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.*

To preserve a complaint of legal sufficiency of the evidence for review after a jury trial, there must be 1) a motion for instructed verdict, 2) a motion for judgment notwithstanding the verdict, 3) objection to submission of a jury question, 4) a motion to disregard the jury's answer to a vital fact, or 5) a motion for new trial. *In the Interest of C.L.*, No. 07-14-00180-CV, 2014 Tex. App. LEXIS 11104, at *11-12 (Tex. App.—Amarillo October 7, 2014, no pet.). A complaint as to factual sufficiency must be preserved by a motion for new trial. *Id.* Here, we find a motion for new trial stating there is "insufficient evidence as to the best interest of the child." However, no mention

is made of the statutory grounds found by the trial court. The failure to do so waives any complaint with respect to those grounds. *Id.*

Even if not waived, termination is permissible if it is found that the parent "constructively abandoned the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services . . . for not less than six months, and: (i) the department . . . has made reasonable efforts to return the child to the parent; (ii) the parent has not regularly visited or maintained significant contact with the child; and (iii) the parent has demonstrated an inability to provide the child with a safe environment." TEX. FAM. CODE ANN. § 161.001(1)(N) (West 2014). Here, the child was removed shortly after her birth on August 29, 2013 while she was still at the hospital. A drug test on the child initially showed positive for methamphetamine. The parents were informed that K.B. would not be allowed to breast feed the child until another drug screen had been conducted, and the Department of Family and Protective Services (the Department) was notified. J.B. then became agitated and belligerent and was forced to leave the hospital premises by police. In talking to K.B., the Department learned of several suicide attempts by her during her pregnancy.[1] Soon after that interview, K.B. left the hospital, against the advice of doctors, and stated she would rather her baby starve and die than be bottle fed. The second drug test came back negative but the parents had disappeared and not returned. J.B. left several voice mail messages for the Department claiming nurses had given his child methamphetamine and that he was going to sue the hospital. The Department then took custody of the child and she had not been returned to the parents

---

[1] One time, K.B. took an overdose of Zoloft and Hydrocodone (which belonged to J.B.) and, another time, she punched herself in the stomach to harm herself and the baby. She blamed the baby for making her depression worse. K.B. has suffered from a depressive disorder most of her life.

3

at the time of the final hearing in January 2015. K.B. admitted at trial that the child had been in the Department's managing conservatorship for six months.

The parents were permitted weekly visits with the child during August, September, and October 2013. However, after several months, the guardian ad litem for the child petitioned for the visits to cease because they were detrimental to the child. K.B. did not know how to hold the child, diaper her, or console her. While J.B. would help her, at some point during the visitations he would begin to rant about his political beliefs and agendas which upset the child. A Department worker would have to take the child away and attempt to calm her. At one time, a Department worker asked J.B. if he could speak in an appropriate manner to his child and his response was, "why would I have to; these are my beliefs and this is what she's going to believe." At the time that visitations stopped, the court informed the parents that they could petition later for visits to recommence, but they never did so. They also never sent the child gifts, letters, money, clothes, toys, or other items. Although J.B. corresponded frequently with the Department by e-mail, he never asked how the child was doing or said he missed her. The parents received photographs of the child from the Department that had been forwarded from the foster parents, but J.B. was more concerned with the size of the photographs, as indicated by numerous e-mails to the Department complaining of the same, rather than their content.[2] When J.B. was offered a picture of his child in person by a Department worker, he called her a "cunt" and a "bitch."[3] At one of the initial

---

[2] Even at the final hearing, J.B. testified that the Department workers were liars when they told him they did not know how to send him larger pictures. J.B. admitted that he used one photograph given to him to track his daughter's location at a trick or treat event which he objected to because it was sponsored by several churches.

[3] J.B. testified he had told the Department that he did not want to receive photographs in person but only wanted them e-mailed.

4

hearings with the Department, J.B. was more interested in discussing his potential lawsuit against the hospital than the custody of his child. This is sufficient evidence of constructive abandonment. *See In the Interest of J.J.O.*, 131 S.W.3d 618, 628-29 (Tex. App.—Fort Worth 2004, no pet.) (finding the evidence sufficient when the mother did not regularly visit or maintain significant contact during the nine-month service plan even though she made twelve visits because she did not speak to the child for the entire hour of the first visit, cancelled one visit 45 minutes after it was to have started, was late for some visits, missed several visits, and went three months without visiting the child after which the child did not recognize its mother).

A service plan was put in place that directed the parents, among other things, to 1) submit themselves to random drug screens, 2) successfully complete parenting classes, 3) demonstrate a legal source of income and be able to provide for their child on an on-going basis, 4) provide and maintain a safe and stable home with working utilities and allow the Department announced and unannounced home visits, and 5) agree to participate in individual or couples counseling and follow all recommendations. Evidence showed that 1) the parties were only asked to submit to one drug screen on a day that they already had a ride to town but they refused to do so because they claimed they would not ask the person giving them a ride to accommodate that request,[4] 2) the parents did not complete parenting classes but blamed their failure on the Department even though the Department mailed them the materials with a paid envelope for them to return their assignments, offered to collect the assignments during home visits, and offered to teach a class to them during which J.B. was disruptive and did not permit the

---

[4] K.B. and J.B. do not have working transportation of their own, and J.B. has not had a driver's license since 2012.

teacher to stay on topic, 3) the only source of income of the parents is a disability payment received by K.B. for her depressive disorder in the amount of $720-730 per month but K.B.'s listing of their expenses was greater than this amount,[5] 4) several times during home visits, it was noted that the house smelled, did not have utilities, trash and boxes were piled up, and the house was not structurally safe for a baby and, although there had been improvements at the time of trial, it was still not at a safe level,[6] 5) J.B. refused to let the Department worker enter the home one time because his wife was not present, and 6) the parents did not successfully complete counseling because the first therapist refused to continue to counsel them after J.B. threatened her, the second counselor likewise encountered a problem with J.B. threatening her practice, being belligerent, ranting about his political views, and refusing to allow K.B. to come alone for counseling, and J.B. refused for he and his wife to attend counseling with the psychologist who performed their psychological evaluations because there was "religious rhetoric on the walls."[7] There was also evidence that J.B. was arrested for domestic violence against his mother-in-law in October 2013, and was found by the sheriff standing over K.B. in a manner that indicated he might be about to assault her. Other evidence indicated that J.B. attempts to interfere in or control his wife's treatment for her depressive condition which has already resulted in multiple suicide attempts.[8]

---

[5] J.B. has computer skills but has not had a regular job since 2012. He claimed there was no work of that kind available where they lived, that he had no transportation, and that he could not commit his time to a job because of the necessity for him to attend hearings with the Department.

[6] The Department worker testified that even when she made announced home visits, she would be left standing outside for ten minutes while the parents cleaned up the house.

[7] The Department provided transportation for the parents to counseling.

[8] He did not want her to take Zoloft during her pregnancy even though he was advised by a doctor that the risk of suicide was greater than the risk of taking the medicine during pregnancy.

A service plan alone is evidence that the Department made reasonable attempts to return the child to the parents, *In the Interest of N.R.T.*, 338 S.W.3d 667, 674 (Tex. App.—Amarillo 2011, no pet.), and there is evidence here that the Department made extra efforts to help them complete the plan. The evidence also supports a finding that the parents are not able to provide the child with a safe environment.

As for evidence establishing that termination was in the best interest of the child, we peruse the record for the existence of the *Holley* factors. *See Holley v. Adams*, 544 S.W.2d 367 (Tex. 1976). Those factors include, among other things, 1) the desires of the child, 2) the emotional and physical needs of the child now and in the future, 3) the emotional and physical danger to the child now and in the future, 4) the parental abilities of the individuals seeking custody, 5) the programs available to assist those individuals to promote the best interest of the child, 6) the plans for the child by those individuals or by the agency seeking custody, 7) the stability of the home, 8) the acts or omissions of the parents indicating that the existing parent-child relationship is not a proper one, and 9) any excuse for the acts or omissions of the parents. *In the Interest of L.L.*, No. 07-14-00395-CV, 2015 Tex. App. LEXIS 1080, at *5-6 (Tex. App.—Amarillo February 4, 2015, no pet.) (mem. op.); *In the Interest of P.E.W.*, 105 S.W.3d 771, 779-80 (Tex. App.—Amarillo 2003, no pet.). It is not necessary that each factor favors termination, and the list is not exclusive. *In the Interest of P.E.W.*, 105 S.W.3d at 779-80. Further, the same evidence supporting the presence of a statutory ground for termination is often relevant when assessing the child's best interest. *In the Interest of L.L.*, 2015 Tex. App. LEXIS 1080, at *6.

In addition to the evidence already mentioned, there is evidence that 1) the parents tend not to take responsibility for their problems but blame them on other people, 2) J.B. has an inflated sense of self-worth, tends to put his thoughts above others, and lacks empathy, 3) K.B. tends to be overly dependent on J.B., 3) J.B. threatened the Department worker and her job and threatened to have her put in jail, 4) J.B. called the guardian ad litem for the child "a fucking perjurer" and testified he plans to have a perjury case brought against her, 5) the child is thriving in her foster home and meeting her developmental milestones, 6) the foster parents want to adopt her, 7) the child is bonded to another child in the foster home, and 8) the child does not know her parents.

It is true that K.B. takes her medication, has not attempted suicide since October 2013, and talks to someone at the Helen Farabee Center on a fairly regular basis. However, there is also evidence that K.B. tends to have to change medication from time to time and appears to have relapses during those periods and that she allows J.B. to control her treatment. Given the precarious nature of her illness and that her support system consists solely of J.B.,[9] the jury did not act unreasonably in concluding that termination was in the child's best interest.

Accordingly, the order of termination is affirmed.


Brian Quinn
Chief Justice

---

[9] K.B. testified she had neighbors that helped her but she did not name them or discuss any instances of help.